# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| MABEL DENTON, Next of Kin of Reginald Denton, deceased, and on behalf of the wrongful death beneficiaries of Reginald Denton, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:20-cv-02282-TLP-tmp |
| v. | ) | |
| | ) | |
| ALLENBROOKE NURSING AND REHABILITATION CENTER, LLC, d/b/a Allenbrooke Nursing and Rehabilitation Center, et al., | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## ORDER DENYING DEFENDANT ALLENBROOKE NURSING AND REHABILITATION CENTER, LLC'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

This case arises from the alleged mistreatment of Reginald Denton while at Allenbrooke Nursing and Rehabilitation Center, LLC, in Memphis, Tennessee. Plaintiff Mabel Denton sues as next of kin of Mr. Denton and on behalf of his wrongful death beneficiaries. Defendant, Allenbrooke Nursing and Rehabilitation Center, LLC,[1] moves to compel arbitration of

---

[1] Plaintiff also names Aurora Cares, LLC; DTD HC, LLC; D&N, LLC; Donald T. Denz; and Norbert A. Bennett (collectively, "Non-Facility Defendants") as Defendants in this suit. (*See* ECF No. 1.) Defendant Allenbrooke moved to compel arbitration (ECF No. 18), and the Non-Facility Defendants moved to dismiss Plaintiff's claims against them for lack of jurisdiction (ECF No. 20). Although the Non-Facility Defendants argue that this Court has no personal jurisdiction over them, they also argue, in the alternative, that if the Court denies their motion to dismiss, the claims against them are also subject to arbitration for the same reasons provided in Defendant Allenbrooke's motion to compel arbitration. (ECF No. 19 at PageID 187.) Contemporaneous with the entry of this order, the Court denied the Motion to Dismiss. (ECF No. 53.)

Plaintiff's claims and for the Court to stay the case pending arbitration.  (ECF Nos. 18 & 19.)
Plaintiff timely responded in opposition.  (ECF No. 24.)  The Court granted Allenbrooke leave
to reply and Plaintiff leave to file a sur-reply.  (*See* ECF Nos. 33 & 34.)

For the reasons below, the Court **DENIES** Allenbrooke's motion to compel arbitration of
Plaintiff's claims.  The Court also **DENIES** Allenbrooke's motion to stay the case.

## BACKGROUND

Plaintiff took her son, Reginald Denton, to Allenbrooke's long-term care and
rehabilitation facility in December 2017.  (ECF No. 1 at PageID 9.)  Allenbrooke then admitted
Mr. Denton who resided at the nursing home until July 2019 when it transferred him to Baptist
Memorial Hospital East.  (*Id.*)  Then Baptist discharged him to Grace Healthcare of Cordova.
(*Id.*)  Mr. Denton passed away in August 2019.  (*Id.*)

Plaintiff alleges that, while under Allenbrooke's care, Mr. Denton suffered mental
anguish, pain and suffering, and physical injuries including, but not limited to, pressure sores,
severe pain, and injuries to his dignity which eventually led to his death.  (*Id.* at PageID 15.)
Plaintiff contends that these injuries arose because of Allenbrooke's negligence in caring for
Mr. Denton.  (*Id.* at PageID 15–16.)

And so Plaintiff sued for "survival and wrongful death" alleging all Defendants were
negligent under the Tennessee Healthcare Liability Act, Tennessee Code Annotated §§ 29-26-
101, et seq.; and, in the alternative, the Non-Facility Defendants are liable for ordinary
negligence.  (*Id.* at PageID 12–20.)  Allenbrooke now moves to compel arbitration and stay this
case pending resolution of that arbitration.  (ECF No. 18.)

When Allenbrooke admitted Plaintiff's son , Plaintiff signed many documents on Mr.
Denton's behalf.  One document was an appointment of surrogate form ("Surrogate Form").

(ECF No. 19-2.)  The form designates Plaintiff as Mr. Denton's surrogate.  (*Id.* at PageID 200.)
The date by her signature is legible.  It reads December 5, 2017.  (*Id.* at PageID 201.)

Mr. Denton's primary physician, Dr. Dana Nash, also signed the form designating
Plaintiff as Mr. Denton's health care surrogate.  (*Id.* at PageID 201.)  Dr. Nash checked a box
reflecting her determination that Mr. Denton lacked capacity to make and communicate health
decisions for himself.  (*Id.*)  But because the date by Dr. Nash's signature is illegible, it is
unclear when Dr. Nash made that determination. (*Id.*)  Ordinarily the date of the doctor's
signature is the date when the surrogate's authority is binding.

But this Surrogate Form included language seeking to backdate Dr. Nash's designation to
when the surrogate signed.  The text above Dr. Nash's signature reads, "[i]t is my intention that
the designation of surrogate is effective back to the date of acceptance by the surrogate, so that
healthcare decisions made by the surrogate for the resident date back to that day are valid."
(*Id.*)

Plaintiff also executed a "Resident and Facility Arbitration Agreement" (the
"Agreement") on December 5, 2017.  (ECF No. 19-1 at PageID 199.)  Plaintiff signed on the
line for "Signature of Family Member or other Representative."  (*Id.*)  The Agreement declares
that it constitutes a "health care decision" and becomes part of the Resident's underlying
Admission Agreement.  (*Id.* at PageID 197.)  The Agreement designates Mr. Denton as the
"Resident."  (*Id.* at PageID 197.)  And it  defines "Resident" as collectively referring "to those
signing with or for the Resident," and designates the "Resident" as a "a third party beneficiary"
of the Agreement.  (*Id.*)

Under the Agreement:

Any and all disputes between the Resident and the Facility shall be submitted to
binding  arbitration  where  the  amount  in  controversy  exceeds  $25,000.   This

> includes any disputes arising out of or in any way relating to this Agreement (its enforceability), the Admission Agreement, or any or the Resident's stays at the Facility, whether existing or arising in the future, whether for statutory, compensatory or punitive damages, and irrespective of the legal theories upon which the claim is asserted.

(*Id.*)  What is more, the Agreement purports to bind both the person receiving services (Mr. Denton) and any person signing on his behalf (Plaintiff) or any of the Resident's "successors, assigns, agents, attorneys, third party beneficiaries, insurers, heirs, trustees and representatives, including the personal representative or executor of the estate, the spouse, children, grandchildren, all decedents and next friends, and any person whose claim is derived through the Resident." (*Id.* at 198–99.)

The Agreement also provides that the Resident may receive services at Allenbrooke, even if the Resident does not sign the Agreement.  (*Id.* at PageID 199.)  It advises those signing that they may consult an attorney (*Id*. at PageID 197) and can revoke the Agreement by written notice within thirty days of signing.  (*Id.* at PageID 199.)

Allenbrooke now moves to compel arbitration relying on the Agreement.  Plaintiff opposes the motion.  The parties present several issues for the Court:

1.  Is Plaintiff challenging the enforceability or the existence of the Agreement?

2.  Did Plaintiff have authority to create a contract between Allenbrooke and Mr. Denton?

3.  Is Mr. Denton bound to the Agreement as a third-party beneficiary?

4.  Is Plaintiff bound to the Agreement in her individual capacity?

5.  Should the Court allow the parties to engage in arbitration-related discovery?

The Court will address these issues in turn.

## COURT'S AUTHORITY TO DETERMINE THE EXISTENCE
## OF A VALID ARBITRATION AGREEMENT

**I.      Legal Standards for Determining the Existence of an Arbitration Agreement**

**A.      The Federal Arbitration Act**

The Agreement says that the arbitrator will apply the law of the state where the facility is located, except that "the parties expressly stipulate that the Federal Arbitration Act, 9 U.S.C. §§ 1–16 shall exclusively govern the enforcement of this Agreement."  (ECF No. 19-1 at PageID 197.)  Although the Tennessee Uniform Arbitration Act ("TUAA"), Tennessee Code Annotated §§ 29-5-301 et seq., governs the conduct of any arbitration, the Federal Arbitration Act ("FAA"), which preempts any conflicting state laws, governs whether the Court has to enforce an arbitration agreement.  *See Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 271–72 (1995).

So the FAA is the starting point for this analysis.  Congress enacted the FAA "to overcome judicial resistance to arbitration."  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).  Under the FAA, a party to a contract may petition a court to compel arbitration.  9 U.S.C. § 4.  Before compelling arbitration, courts first determines whether the parties agreed to arbitrate.  *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000).  Next, a court has to decide the scope of that agreement.  *Id.*  Finally, if not all the claims are referred to arbitration, the court must decide whether to stay the remainder of the case.  *Id.*

Section 2 of the FAA reflects the Act's breadth.  Under this section,

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  Also "any ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration."  *Stout*, 228 F.3d at 714.  But despite the FAA's broad reach, plaintiffs can challenge an arbitration agreement under the savings clause in § 2.  Under the savings clause, a party can invalidate an arbitration agreement "upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  A party therefore can challenge the validity, enforceability, or formation of an arbitration agreement.

But who determines the validity, enforceability, or formation of an arbitration agreement—the Court or the arbitrator?  It often depends on the contract.  *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 69–70 (2010) (finding "arbitration is a matter of contract," and "[a]n agreement to arbitrate a gateway issue" proper under the FAA).  Parties can agree to delegate "threshold arbitrability question[s] to an arbitrator," such as whether the arbitration agreement applies to a particular issue.  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019).  When parties do delegate such questions to the arbitrator, "a court possesses no power to decide the arbitrability issue."  *Id.* at 529.  But courts do have power when the question is whether an arbitration agreement exists.

Whether an arbitration agreement exists is a question for the court, not the arbitrator.  *Id.* at 530 ("[T]he court determines whether a valid arbitration agreement exists"); *Granite Rock Co. v. Int'l Broth. of Teamsters*, 561 U.S. 287, 297 (2010); *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 547 (1964); s*ee also* 9 U.S.C. § 3 (directing court to stay case and refer issue to arbitration "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement").  "[N]o matter how strong the federal policy favors arbitration, 'arbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration.'"  *Simon v. Pfizer*

*Inc.*, 398 F.3d 765, 775 (6th Cir. 2005) (quoting *United Steelworkers, Loc. No. 1617 v. Gen. Fireproofing Co*., 464 F.3d 726, 729 (6th Cir. 1972)).  Courts therefore decide whether a contract exists.

### B.    Burden of Proof on a Motion to Compel Arbitration

The Sixth Circuit treats motions to compel arbitration like motions for summary judgment.  *Great Earth Cos., Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002).  The court views all facts and inferences in the light most favorable to the nonmoving party.  *Id.*  The movant "bears the ultimate burden of establishing the existence of a valid agreement to arbitrate," and must present "some evidence" that the parties agreed to arbitrate.  *Hammond v. Floor & Decor Outlets of Am., Inc.*, No. 3:19-cv-01099, 2020 WL 2473717, at *3 (M.D. Tenn. May 13, 2020); *Foust v. Comcast Corp*., No. 3:19-CV-173-HSM-DCP, 2020 WL 1891755, at *4 (E.D. Tenn. Jan. 28, 2020).  Once the movant makes a prima facie showing of the agreement's existence, the party opposing arbitration "must show a genuine issue of material fact as to the validity of the agreement to arbitrate."  *Great Earth Cos., Inc.*, 288 F.3d at 889.

### II.    Analysis of Defendant's Delegation Argument

The Agreement here says that all disputes "arising out of or in any way relating to this Agreement (its enforceability), the Admission Agreement, or any of the Resident's stays at the Facility" must go to arbitration.  (ECF No. 9-1 at PageID 197.)  Plaintiff argues that, when she signed the Agreement, she lacked authority to enter a contract for Mr. Denton.  (ECF No. 24 at PageID 254.)  This, she claims, is a question of contract existence.  Allenbrooke, however, argues that Plaintiff challenges the enforceability of the agreement.  (ECF No. 33 at PageID 504– 505.)  And so Allenbrooke argues that the Court should refer the case to arbitration without first deciding whether Plaintiff had authority to enter the Agreement on Mr. Denton's behalf.  (*Id.*)

But Allenbrooke's argument is not convincing.  Instead, the Court finds that Plaintiff challenges the existence of the arbitration agreement.  Plaintiff argues that she lacked authority to enter the Agreement on Mr. Denton's behalf.  If Plaintiff lacked the authority to enter the Agreement, then Allenbrooke and Mr. Denton never formed a binding contract.  In other words, no arbitration agreement exists between the parties here unless Plaintiff properly signed as Mr. Denton's surrogate.

Allenbrooke also argues that, by personally signing the Agreement, Plaintiff herself agreed individually to arbitrate her claims.  (ECF No. 33 at PageID 504–505.)  But again, this raises a question about the existence of a contract, not its enforceability.  So before the Court can send Plaintiff's claims to arbitration, it first has to determine: (1) if Plaintiff had the authority to create a contract between Allenbrooke and Mr. Denton; and (2) if Allenbrooke and Plaintiff formed a contract that binds Plaintiff in her individual capacity.

<u>**CONTRACT BETWEEN ALLENBROOKE AND MR. DENTON**</u>

**I.      The Court's Subject Matter Jurisdiction**

This Court has diversity jurisdiction over Plaintiff's claims.  The parties are diverse and the amount in controversy exceeds $75,000.[2]

**II.     Choice of Law Analysis**

The Court begins with the FAA.  Under the FAA, courts must enforce arbitration agreements unless state law contract principles instruct otherwise.  9 U.S.C. § 2.  When acting under diversity jurisdiction, federal courts apply the choice of law rules of the forum state.  *State Farm Mutual Auto. Ins. Co. v. Norcold, Inc.*, 849 F.3d 328, 331 (6th Cir. 2017).  Without a

---

[2] See the Court's order on Defendants' Motion to Dismiss (ECF No. 53), issued concurrently with this opinion, for a full analysis of this Court's subject matter jurisdiction.

choice of law provision in the contract, Tennessee applies the rule of "lex loci contractus," which presumes that "a contract is []to be governed by the law of the jurisdiction in which it was executed absent a contrary intent." *Blackwell v. Sky High Sports Nashville Operations, LLC*, 523 S.W.3d 624, 632 (Tenn. Ct. App. 2017) (quoting *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 474–75 (Tenn. Ct. App. 2003)).  And when all parties "have acquiesced—without comment—to the use" of a certain state's law, a federal court does not have to "delve too deeply" into the choice of law analysis. *GBJ Corp. v. E. Ohio Paving Co.*, 139 F.3d 1080, 1085 (6th Cir. 1998).

The parties here did not stipulate about what law applies, and the Agreement does not identify where the parties executed it.  Yet both parties seem to agree that Plaintiff signed the forms when Allenbrooke admitted Mr. Denton into its facility in Memphis, Tennessee.  (ECF Nos. 19 at PageID 188; 24 at PageID 253.)  So most likely the parties executed the documents in Tennessee.  And Plaintiff and Mr. Denton were both Tennessee residents when Plaintiff executed the Agreement, and Allenbrooke's facility is in Tennessee.  (ECF No. 1 at PageID 1–2.)  What is more, the Surrogate Form says that it is the appointment of surrogate form for Tennessee.[3]  (ECF No. 19-2 at PageID 200.)  And both the Agreement and Surrogate Form implicate events and services performed in Tennessee.

In addition, the parties "have acquiesced—without comment—to the use" of Tennessee law.  *GBJ Corp.*, 139 F.3d at 1085.  Both parties rely on federal law and Tennessee law in their briefings.  (ECF Nos. 24 at PageID 253; 19 at PageID 33; *see also* ECF Nos. 1, 24-2 & 34.)

---

[3] The title of the form reads, "**<u>APPOINTMENT OF SURROGATE</u>** (Tennessee)."  (ECF No. 19-2 at PageID 200.)

In short, the parties both assumed Tennessee law applies to this dispute.  So the Court does not have to "delve too deeply" into the choice of law analysis.  *GBJ Corp.*, 139 F.3d at 1085.  For these reasons, the Court applies principles of Tennessee contract law.

## I.    Legal Standards for Determining Plaintiff's Authority

### A.    The Tennessee Health Care Decisions Act

If Plaintiff had the authority to sign the Agreement on Mr. Denton's behalf, then a binding agreement to arbitrate exists between Allenbrooke and Mr. Denton.  Under § 68-11-1806 of the Tennessee Health Care Decisions Act ("THCDA"), a surrogate may make a health care decision for an adult patient "if, and only if" the parties satisfy these circumstances:

(1) The patient has been determined by the designated physician to lack capacity; and

(2) No agent or guardian has been appointed or the agent or guardian is not reasonably available.

T.C.A. § 68-11-1806(b).  The Act defines "health care decision" as "consent, refusal of consent or withdrawal of consent to health care," and the term "health care" includes "any care, treatment, service or procedure to maintain, diagnose, treat, or otherwise affect an individual's physical or mental condition . . . ."  § 68-11-1802(a)(6) & (7).

"The statutory language is directive, mandating that both the determination of the patient's incapacity and the identification of the patient's surrogate be made by the patient's 'designated physician,' the physician with primary responsibility for the patient's case."  *Barbee v. Kindred Healthcare Operating, Inc.*, No. W2007-00517-COA-R3-CV, 2008 WL 4615858, at *11 (Tenn. Ct. App. Oct. 20, 2008).  What is more, "a surrogate may make health care decisions on the patient's behalf only if these

requirements are met." *Id.*  Even if the patient were clearly incapacitated when the surrogate made the health care decision, the surrogate's authority only becomes valid once the individuals satisfy the statutory requirements.  *Id.* at *11–12.  That said, who has the burden of proof?

### B.    Burden of Proof

"[T]he burden of proving the existence of a valid contract is upon the person relying on the contract."  *Randolph v. Randolph*, 937 S.W.2d 815, 821 (Tenn. 1996); *Next Generation, Inc. v. Wal-Mart, Inc.*, 49 S.W.3d 860, 864 (Tenn. Ct. App. 2000) (finding that the party relying on the contract has to prove its existence by a preponderance of the evidence).  The movant in a motion to compel arbitration "bears the ultimate burden of establishing the existence of a valid agreement to arbitrate."  *Hammond*, 2020 WL 2473717, at *3.  And "[t]he burden of proving that one had authority to make health care decisions for another under the THCDA lies with the party seeking to establish that authority."  *Brown v. Quince Nursing & Rehab. Ctr., LLC*, No. 2:18-cv-2740, 2020 WL 4673471, at *4 (W.D. Tenn. Aug. 12, 2020); *Barbee*, 2008 WL 4615858, at *12 (finding that defendants failed to carry burden of proving plaintiff had authority to execute arbitration agreement on decedent's behalf).  So the burden here lies with Allenbrooke.

## II.    Analysis of Plaintiff's Authority to Sign the Agreement on Mr. Denton's Behalf

Signing the Agreement is a health care decision under the THCDA.[4]  Under § 68-11-1806, a surrogate can make a health care decision for a patient "if, and only if," the patient "has been determined by the designated physician to lack capacity."  And here, Dr. Nash found that

---

[4] The Agreement qualifies as a health care decision under T.C.A. § 68-11-1802(a)(6) & (7). Furthermore, the Agreement specifically states that it is a health care decision.  (ECF No. 19-1 at PageID 197.)

Mr. Denton lacked capacity.  (ECF No. 19–2 at PageID 201.)  But the question remains *when* did Dr. Nash make that determination—before or after Plaintiff signed the Agreement.

According to the plain language of the statute, the physician has to make the capacity determination before the surrogate qualifies to make a health care decision for the patient.  First, the statute says that  a surrogate can act "if, and only if" a physician declares the patient incompetent.  Second, a surrogate can act for the patient only if the patient "has been determined" to lack capacity by the physician.  By using the words "has been" instead of "will be" or "is," the statute suggests that the physician should make the capacity determination *before* the surrogate can make a health care decision for the patient.  So the plain language of the statute reflects that the timing of the capacity determination is crucial.

The part of the Surrogate Form where Dr. Nash signed is pre-printed and it says "[i]t is my opinion that this is true both on the day the surrogate accepted the appointment and today.  It is my intention that the designation of surrogate is effective back to the date of acceptance by the surrogate, so that healthcare decisions made by the surrogate for the resident date back to that day are valid."  (ECF No. 19-2.)  This language differs from the plain language of the THCDA.  Under § 68-11-1806, a surrogate's health care decision is valid only after the physician determines capacity.  The statute says that the surrogate's authority kicks in when the patient "has been determined" to lack capacity.  Tenn. Code Ann. § 68-11-1802.  So despite the Surrogate Form's language to the contrary, a physician has to make the capacity determination before a surrogate's health care decisions are "valid."[5]

---

[5] Without delving too deeply into the attempt by Allenbrooke to use preprinted language to make Dr. Nash's determination retroactive, the Court simply finds that passage unpersuasive.

This Court agrees with the analysis of the court in *Sanders v. Allenbrooke et al.*, No. 2:20-cv-02001, 2020 WL 5576696, at *7 (W.D. Tenn. Sept. 17, 2020).  There, the court found that "the THCDA provides an order of operations for the appointment of a health care surrogate."  *Id.*  The physician must find that the patient lacks capacity *before* a surrogate can make a health care decision on the patient's behalf.  *See id.*  This analysis aligns with the Tennessee Court of Appeals reading of § 68-11-1806(b).  *See Barbee*, 2008 WL 4615858, at *12 (finding patient's son lacked authority as surrogate because physician had not made "the requisite determination that the Decedent lacked capacity to make and communicate her health care decisions" before son signed admission documents); *McKey v. Nat'l Healthcare Corp.*, No. M2007-02341-COA-R3-CV, 2008 WL 3833714 (Tenn. Ct. App. Aug. 15, 2008) (finding that physician must make "a prior determination" that patient lacks capacity before surrogate can be authorized to act on patient's behalf under the THCDA).

With that in mind, the central question here is when Dr. Nash signed the Surrogate Form.  Plaintiff signed it on December 5, 2017.  (ECF No. 19-2 at PageID 201.)  And she signed the arbitration agreement that same day.  (ECF No. 19-1 at PageID 199.)  At some point, Dr. Nash determined that Mr. Denton lacked capacity and then signed and dated the Surrogate Form.  But the date of Dr. Nash's signature is illegible to the Court.  (*Id.* at PageID 201.)

Most of Plaintiff's response here centers on the timing of Dr. Nash's signature.  (*See* ECF No. 24.)  Plaintiff argues that, though the date is "not entirely legible," the earliest Dr. Nash signed the Surrogate Form was December 18, 2017—thirteen days after Mr. Denton signed the Agreement.[6]  (*Id.* at PageID 259.)  Plaintiff filed an affidavit swearing that no physician was

---

[6] Though Plaintiff admits it cannot interpret Dr. Nash's handwriting, Plaintiff asserts that the "reasonable conclusion is that the date of [Dr. Nash's] signature on the surrogate form is

present when Allenbrooke gave her the Surrogate Form.  (ECF No. 24-1 at PageID 270.)  She

swears that no physician had signed the Surrogate Form when Allenbrooke gave it to her.  (*Id.*)

And Plaintiff swears that, to her knowledge, Dr. Nash never examined Mr. Denton before his

admission to Allenbrooke.  (*Id.*)  Allenbrooke has no evidence to the contrary.

In fact, Allenbrooke hardly references the timing of Dr. Nash's capacity determination

here.  Instead, Allenbrooke asserts generally that Dr. Nash made the capacity determination at

the time of Mr. Denton's admission.  (ECF No. 19 at PageID 188, 192.)  In its reply brief,

Allenbrooke did not refute or even address Plaintiff's contention that Dr. Nash signed the

Surrogate Form December 18, 2017.  Thus, on the facts before it, Defendant has not convinced

the Court that Dr. Nash completed the Surrogate Form on a date before Plaintiff signed the

Agreement.  So Allenbrooke failed to meet its burden to show that Plaintiff had the authority to

form a contract on Mr. Denton's behalf, and so failed to show that a contract exists between it

and Mr. Denton.

Even still, the Court next must determine whether Plaintiff agreed to arbitrate her alleged

claims.  This analysis requires that the Court determine whether Plaintiff agreed to arbitrate both

her claims on behalf of Mr. Denton and her individual survival and wrongful death claims.

## CONTRACT BETWEEN ALLENBROOKE AND PLAINTIFF

## I.     Legal Standards for Determining whether Allenbrooke and Plaintiff Formed a Contract

Normally, a representative who signs a contract on behalf of another does not bind herself.

*84 Lumber Co. v. Smith*, 356 S.W.3d 380, 382 (Tenn. 2011).  But a representative may still bind

herself if the contract shows an intent to bind the representative in her personal capacity.  *Id.*; *see*

---

December 18, 2017" and that "it is clear that Dr. Nash did not sign the form on December 5, 2017."  (ECF No. 24 at PageID 259.)

*also Nazi v. Jerry's Oil Co., Inc.*, No. W2013-02638-COA-R3-CV, 2014 WL 3555984, at \*8 (Tenn. Ct. App. July 18, 2014) ("It is well-settled that the intent of the contracting parties at the time of executing the agreement should govern."). Courts determine the intent of the parties based on the ordinary meaning of the language in the contract. *84 Lumber Co.*, 356 S.W.3d at 383. If the contract is ambiguous, however, the court may "look beyond the four corners of the document and consider extrinsic evidence in order to determine the parties' intention." *Cummings Inc. v. Dorgan*, 320 S.W.3d 316, 333 (Tenn. Ct. App. 2009).

## II.     Analysis of Whether Plaintiff's Claims Must Be Arbitrated

### A.     Plaintiff's Claims on Behalf of Mr. Denton

The Agreement defines "Resident" as collectively referring "to those signing with or for the Resident." (ECF No. 19-1 at PageID 197.) And the Agreement further says that the "Resident" is "a third-party beneficiary" of the Agreement. (*Id.*) If Allenbrooke argues an arbitration agreement exists between it and Mr. Denton as a third-party beneficiary, such an argument lacks merit.

Courts will enforce arbitration clauses against a third party to a contract only when the third party tries to enforce the contract. *See Benton v. Vanderbilt Univ.*, 137 S.W.3d 614, 618 (Tenn. 2004); *see also LaSalle, Inc. v. Int'l Broth. Elec. Workers Loc. No. 665*, 336 F. Supp. 2d 727, 730 (W.D. Mich. 2004). Plaintiff here is not trying to enforce the Agreement on behalf of Mr. Denton as a third-party beneficiary. Quite the opposite. Instead, Allenbrooke is trying to enforce the contract against an alleged third-party beneficiary. As a result, Allenbrooke cannot enforce the Agreement against Mr. Denton as a third-party beneficiary of the Agreement. So Plaintiff need not arbitrate her claims brought on Mr. Denton's behalf.

**B.    Plaintiff's Survival and Wrongful Death Claim**

Allenbrooke argues that Plaintiff personally agreed to arbitrate any disputes over the enforceability of the Agreement.  (ECF No. 33 at PageID 504–05.)  To do so, however, Plaintiff must have signed the Agreement in her individual capacity.  If Plaintiff did, in fact, enter the contract in her personal capacity, her survival claim and her wrongful death action must go to arbitration.[7]

Plaintiff executed the Agreement upon Mr. Denton's admission to Allenbrooke's care. (ECF No. 19-1.)  Under the Agreement,

> Any and all disputes between the Resident and the Facility shall be submitted to binding arbitration where the amount in controversy exceeds $25,000.  This includes any disputes arising out of or in any way relating to this Agreement (its enforceability), the Admission Agreement, or any or the Resident's stays at the Facility, whether existing or arising in the future, whether for statutory, compensatory or punitive damages, and irrespective of the legal theories upon which the claim is asserted.

(*Id.* at PageID 197.)

The Agreement gets confusing where it tries to define the term "Resident."  First, it designates Mr. Denton as the "Resident."  (*Id.* at PageID 197.)  But then the Agreement defines "Resident" as collectively referring "to those signing with or for the Resident."  (*Id.*)  The Agreement also says the Resident is "a third-party beneficiary" of the Agreement.  (*Id.*)  So it seems like the Agreement is trying to bind Plaintiff in her individual capacity.  But the language is illogical.

---

[7] Under Tennessee law, a surviving spouse does not represent the decedent when bringing a wrongful death action.  *Beard v. Branson*, 528 S.W.3d 487, 502 (Tenn. 2017).  Instead, the surviving spouse asserts her own right of action.  *Id.* ("[I]n a wrongful death lawsuit, the surviving spouse asserts his own right of action for his own benefit").  So while Plaintiff's claims on behalf of Mr. Denton are not subject to arbitration, we consider whether her personal claims must go to arbitration.

According to the Agreement, Plaintiff is the "Resident," signing the Agreement in her individual capacity. But we know Allenbrooke did not admit Mabel Denton to its facility. Plaintiff also signs <u>for</u> the "Resident," Mr. Denton. The Agreement then says Mr. Denton is a third-party beneficiary. And so the Agreement is unclear about the parties to it. Nor is it clear which "Resident" is a third-party beneficiary. Applying the Agreement's plain language, the "Resident," both Plaintiff and Mr. Denton, are third-party beneficiaries.

Moreover, the Agreement in its entirety reflects that the "Resident" is really the patient, not the patient's representative. For instance, the Agreement says that "the Resident will be allowed to receive services at the Facility," and the Agreement requires that the parties arbitrate any disputes connected to the "Resident's stays" at the facility. (*Id.*) Such references suggest that the term "Resident" refers to the patient—not the representative signing for the patient. What is more, Plaintiff signed the Agreement in the line for "Signature of Family Member or other Representative"—not the line for "Signature or Mark of Resident." (*Id.* at PageID 199.)

In *84 Lumber Co. v. Smith*, the Tennessee Supreme Court found that the president of a company signed a commercial credit agreement in both his personal and representative capacity. 356 S.W.3d at 383. There, however, the language of the contract distinguished between the person signing the contract (the personal guarantor) and the company (the applicant). *Id.* The court emphasized that the language in the contract "clearly distinguishes between 'I,' the person signing the contract, and the 'above business,'" the applicant seeking the commercial credit account. *Id.* What is more, the contract specified which terms applied to both the personal guarantor and the applicant. *Id.* For example, the contract's terms and conditions clarified that both the applicant and the personal guarantor waived the right to a jury trial. *Id.* at 383 n.3. As a

17

result, the contract's language reflected that the president signed in both a representative and individual capacity.

Unlike the agreement in *84 Lumber Co. v. Smith*, the Agreement here does not clearly distinguish between the person signing the contract and the resident. Allenbrooke asserts that "[t]he language of the document [Plaintiff] signed makes plain that she is personally bound to arbitrate the claims she now raises." (ECF No. 33 at PageID 507.) But when interpreting the contract according to its terms, it is unclear who is bound by the contract in an individual capacity, who is a representative, and who is a third-party beneficiary. With that in mind, a surrogate signing the Agreement would not understand whether the Agreement binds the surrogate in an individual capacity or merely as a representative.

Because the language in the Agreement is ambiguous, the Court can look "beyond the four corners of the document" to determine the parties' intent. *Cummings*, 320 S.W.3d at 333. Here, extrinsic evidence shows Plaintiff entered the contract as Mr. Denton's representative. Plaintiff signed the paperwork as part of Mr. Denton's admission to the facility. (ECF Nos. 19 at Page ID 188; 24 at PageID 253.) If Mr. Denton could complete the paperwork himself, Plaintiff would have no reason for signing the documents. But because Mr. Denton lacked capacity, he needed a representative to complete his paperwork for him[8]. When Plaintiff signed the agreement, she made a health care decision for Mr. Denton—not herself. So the evidence surrounding Mr. Denton's admission and Plaintiff's attempted surrogate appointment suggest that Plaintiff did not sign the Agreement in her personal capacity.

---

[8] But, as noted above, that paperwork was not valid until Dr. Nash determined that Mr. Denton lacked the capacity to sign for himself.

18

Besides, Tennessee courts have rejected Allenbrooke's argument, and their reasoning is sound. *Ricketts v. Christian Care Ctr., Inc*., No. M2007-02036-COA-R9-CV, 2008 WL 3833660, at *4 (Tenn. Ct. App. Aug. 15, 2008); *Jones v. Allenbrooke Nursing & Rehab. Ctr. LLC*, No. W2019-00448-COA-R3-CV, 2019 WL 6842372, at *6 (Tenn. Ct. App. Dec. 16, 2019) (affirming reasoning of *Ricketts*).  In *Ricketts v. Christian Care Center*, a family member signed a nursing home admission and arbitration agreement as the patient's representative.  2008 WL 3833660, at *1.  The court found that the arbitration agreement did not bind the family member personally because she did not enter the contract on her own behalf, but acted as the patient's representative.  *Id.* at *4.  And finding that the contract bound the family member personally (instead of the patient) would "circumvent the threshold requirement that there be a valid arbitration agreement."  *Id.*  Other courts in the Western District of Tennessee have also rejected Allenbrooke's argument.  *Sanders*, 2020 WL 5576696, at *9; Order Denying Defendant Quince Nursing and Rehabilitation Center, LLC's Motion to Compel Arbitration and Stay Proceedings, *Sykes v. Quince Nursing & Rehab. Ctr.*, No. 2:19-cv-02602-SHL-tmp (W.D. Tenn. Sept. 1, 2020) (ECF No. 54 at PageID 762–63); *c.f. Brown*, 2020 WL 4673471, at *10–*11.

Plaintiff here signed the document as a "Family Member or other Representative."  (ECF No. 19-2 at PageID 199.)  Even Allenbrooke notes that Plaintiff "signed the admissions paperwork on Mr. Denton's behalf . . . ."  (ECF No. 19 at PageID 189.)  Plaintiff signed the admissions paperwork, including the Agreement, only because she believed Mr. Denton could not do so himself.  Thus, despite its effort to bind Plaintiff to the Agreement, no arbitration agreement exists between Allenbrooke and Plaintiff in her personal capacity.  The Agreement here does not bind Plaintiff to arbitrate her survival and wrongful death claim.

## ALLOWING LIMITED DISCOVERY

Both parties request limited arbitrationrelated discovery as an alternative to the Court ruling against them on this motion.  (*See* ECF Nos. 24 at PageID 265; 33 at PageID 510-11).  Neither party however moved for discovery—instead, the parties include the request for limited discovery as a fallback position in their responsive briefings.  (See *id.*)

In its reply, Allenbrooke requests discovery related to the timing of the capacity determination here.  (ECF No. 33 at PageID 510.)  It claims that "the parties will need to take Plaintiff's deposition, inquire as to whether Ms. Denton had a Power of Attorney, retain Plaintiff's prior medical records, and engage in discovery related to the execution of the surrogacy form and the extent of Ms. Denton's authority."  (*Id.*)

But the time to address the timing of the capacity determination has passed.  In her response, Plaintiff attached her affidavit swearing that no physician was present when she signed Allenbrooke's Surrogate Form; that no physician signed the form before Allenbrooke gave it to her; and that, to her knowledge, Dr. Nash never examined her son before his admission to Allenbrooke's facility.  (ECF No. 24-1 at PageID 270.)  And Plaintiff argues that Dr. Nash's signature date reads December 18, 2017.  (ECF No. 24 at PageID 259.)

Allenbrooke could have responded to Plaintiff's arguments in its reply.  But beyond Allenbrooke's general statements that Dr. Nash made the capacity determination at the time of admission,[9] it makes no other assertion that Dr. Nash signed the Surrogate Form before Plaintiff executed the Agreement.  What is more, Allenbrooke could have attached an affidavit of its own that contested Plaintiff's statements.  But it did not do so.

---

[9] Allenbrooke only references the capacity determination's timing twice—each time Allenbrooke makes a general assertion that Dr. Nash determined Mr. Denton lacked capacity at the time of his admission to Allenbrooke.  (ECF No. 19 at PageID 188, 192.)

All in all, the Court finds that the time has passed for limited discovery on the timing of the capacity determination. As the case progresses, Allenbrooke can renew its motion to compel arbitration if discovery leads to new information on this issue. The Court therefore DENIES the parties' requests for limited discovery and **DENIES WITHOUT PREJUDICE** Allenbrooke's motion to compel arbitration.

## CONCLUSION

The Court finds that no valid arbitration agreement exists between the parties. Plaintiff lacked authority to enter the Agreement for Mr. Denton. Moreover, Allenbrooke cannot bind Mr. Denton to the Agreement as a third-party beneficiary of the contract. And Plaintiff did not enter the Agreement in her personal capacity. Finally, limited discovery is unnecessary. The Agreement therefore does not bind Plaintiff to arbitrate any of its claims. The Court **DENIES WITHOUT PREJUDICE** Allenbrooke's motion to compel arbitration and stay the case.

**SO ORDERED**, this 16th day of October, 2020.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE